# Black *et al. versus* The Philadelphia and Reading Railroad Co.

1. Where a railroad track is on a public street, owners of property in the vicinity, to sustain a complaint for constructing and maintaining it, must establish that it is a public nuisance, and that they have sustained special damage.

2. In the authority to the Philadelphia and Reading Railroad Company to construct a *railroad* are included *ex vi termini,* sidings and branches to their wharves, &c.

April 1st 1868. Before THOMPSON, C. J., STRONG, READ, AGNEW and SHARSWOOD, JJ.

Appeal from the decree at Nisi Prius : In Equity. No 11, to July Term, 1865.

This proceeding was commenced by a bill by William Black and others, owners of houses and lots on William street, Philadelphia, against the Philadelphia and Reading Railroad Company.

The bill avers that the plaintiffs are owners respectively of

[Black *v.* Philadelphia and Reading Railroad Co.]

lots of ground on the north-easterly side of William street, on which are houses and places of business; that the defendants own a large lot of ground on the south-westerly side of William street, extending from Richmond street to the river Delaware, upon which their coal-wharves are erected, and which is traversed by numerous railroad tracks for carrying coal to their wharves; that the defendants have constructed a track to William street, and have commenced to extend it at grade across William street, near the houses and lots of the plaintiffs, and across Bath and Bank streets in that vicinity, to ground owned by the defendants on the river Delaware, between William and Ann streets, for transportation of freight in railroad cars; that thus making the railroad across William and the other neighboring streets will be a serious nuisance to the plaintiffs' houses and lots, by reason of the danger from accidents to passers, peril of fire to the adjacent houses and obstruction to the public highway, and will materially diminish the value of their property for sale or lease.    The plaintiffs prayed that the defendants might be restrained from entering upon William, Bath and Bank streets for the purpose of laying a railroad, and from doing any act tending to encumber or prevent the free and common use of those streets, &c.

The defendants answered, amongst other things, that in 1864 they constructed a road from their main stem across their lot to William street, purposing to cross William and Bank streets to the river, when, in August 1864, objections to their right having been made by residents in the vicinity, the work was suspended to enable them to test the right.    The suspension of the work continued until May 25th 1865, when it was resumed and completed. They denied that the track is a nuisance to the property mentioned in the bill, or that it will be injurious to business, or diminish the value of the property.    They averred that the track is required for their business, and that they cannot avail themselves of their river front without crossing William street.    For their power to construct the track, they referred to their act of incorporation of April 4th 1833, with its supplements of April 13th 1846 and April 12th 1864, and to municipal ordinances of the district of Richmond, March 1st 1854, and of the city of Philadelphia, November 21st 1860; that a plan for crossing William street at grade, and one by trestlework, were submitted to the city surveyor, who made no objection to the crossing at grade. The act of incorporation of April 4th 1833, authorized the defendants to make a road with as many tracks as they may deem necessary, terminating at some suitable point in or near Philadelphia; also, to enter upon and occupy all land on which the railroad, its depots, &c., may be located, or which may be necessary for engine, water stations, or any other purpose necessary or useful in the construction and repair of the railroad.    The Act of April 13th

[Black *v.* Philadelphia and Reading Railroad Co.]

1846 authorized the Pennsylvania Railroad Company to make lateral roads and branches from their main line as they may deem advantageous and suited to promote the interests of the company, and the Act of April 12th 1864 extended these provisions to the defendants.

The ordinance of the district of Richmond of March 1st 1854 authorized the defendants to construct tracks across William street to the northern line of their property, to be located as might thereafter be agreed on by the district and the defendants. By the Consolidation Act of February 2d 1854, all the powers, privileges, &c., of the district of Richmond were vested in the city of Philadelphia, and by an ordinance of the city, passed November 2d 1860, the defendants were authorized to pass two tracks over William and Bank streets, at an elevation corresponding with the track on their coal-wharves, "for which purpose they shall be allowed to place a trestle in the centre of William and Bank streets."

At the instance of the plaintiffs an examiner was appointed, who took and reported testimony bearing on the question of the injury to the property of the plaintiffs from the construction of the track. There was evidence that the trains were backed down a heavy grade frequently on every day; that it is not safe for wagons to drive there; that foot passengers are in danger of being run over; that the existence of the road has driven the trade off William street; that the residents in the vicinity are "hemmed in," and that in consequence property is depreciated in value.

Read, J., sitting at Nisi Prius, dismissed the bill: from his decree the plaintiffs appealed.

*P. McCall*, for appellants.—If the defendants have no authority to cross William street, the defendants having suffered special damage are entitled to relief: Corning *v.* Lowerre, 6 John. C. R. 439; Milhau *v.* Sharp, 15 Barb. 193; s. c., 28 Id. 228; Davis *v.* Mayor, 4 Kern. 506; Whitfield *v.* Rogers, 26 Miss. 84. He referred to the General Railroad Law, the act incorporating the defendants and its supplements, and the municipal ordinances.

The defendants must have a grant of power from the Commonwealth: Commonwealth *v.* Erie & N. E. Railroad, 3 Casey 339; Pittsburg *v.* Pennsylvania Railroad, 12 Wright 355; Wartman *v.* City, 9 Casey 202; Commonwealth *v.* Bowman, 3 Barr 202; Commonwealth *v.* Rush, 2 Harris 186; Mercer *v.* Pittsburg, F. W. & Ch. Railroad, 12 Casey 99.

*J. E. Gowen*, for appellees, referred to the Acts of Assembly and ordinances before mentioned: Chicago, B. & Q. Railroad, 17 Ill. 123; New York and Erie Railroad *v.* Young, 9 Casey 175;

Anspach *v.* Mahanoy & B. M. Railroad, Legal Int. 1864, p. 212; Pittsburg *v.* Pennsylvania Railroad, *supra.*

The opinion of the court was delivered, May 7th 1868, by

READ, J.—This is a bill in equity by the owners of houses and lots of ground on the north-easterly side of William street, in the Twenty-fifth Ward of the city, asking for an injunction against the defendants, the practical effect of which would be to take up and destroy one of their tracks at the termination of their railroad on the river Delaware. The ground on which the plaintiffs found their application is, that this track crosses William, Bath and Bank streets at grade, and is a public nuisance from which the plaintiffs suffer special damage not shared by their fellow-citizens. The track complained of is in certain public streets, and not upon any property of the plaintiffs, and, if a nuisance, is a public one, which could be the subject of a public prosecution, which the Commonwealth have not deemed proper to institute. The plaintiffs are therefore bound to make out two things: 1st, that this is a public nuisance; and, 2d, that the plaintiffs have sustained special damage, which if they do not prove, renders the first question immaterial. We do not think that the plaintiffs have by the single witness examined by them established that they have suffered an injury quite distinct from that of the public in general (2 Story's Eq. 924, a, 18 Law Times 126), and of course upon that ground the decree below should be affirmed. But as the first question whether it is a public nuisance has been discussed at length, we have thought it proper to express our views upon it.

By the Act of 4th April 1833, under which the defendants were incorporated, their railroad might terminate "at some suitable point in or near the city of Philadelphia," "or on the line of the Philadelphia and Columbia, or of the Philadelphia, Germantown and Norristown Railroad," and under these powers they constructed a railroad terminating on the river Delaware at Richmond, near the then city of Philadelphia.

A coal railroad terminating on a navigable river must, in the course of thirty-five years, necessarily increase its wharf accommodation far beyond its original wants, and this must necessarily increase the number of tracks or branches leading from the main stem to its various wharves, where the coal is shipped to all parts of the United States. "The word 'railroad' *ex vi termini* includes sidings," and must of necessity include the present track or branch which is complained of by the plaintiffs. The fact that the tonnage has increased to 4,400,000 tons in twenty-two years, shows the propriety of giving such a fair and liberal construction to the chartered powers of the company.

But this would appear to be a branch railroad within the meaning of the 17th section of the Act of 13th April 1846, which

[Black *v.* Philadelphia and Reading Railroad Co.]

has been extended by the Acts of the 12th April 1864, Pamph. L. 396, to the Philadelphia and Reading Railroad Company. This was decided in The Mayor, &c., of Pittsburg *v.* The Pennsylvania Railroad Company, 12 Wright 355, where the branch started from the terminus in Pittsburg, crossed the Monongahela by a bridge and connected their road with the Pittsburg and Steubenville Railroad in South Pittsburg. The approval of the route by the Richmond ordinance of 1854, and by the city ordinance of 1860, makes the two cases identical in their features.

The necessity and propriety of this construction are best shown by the statistics of the coal trade at Port Richmond in 1867, in which year from that point 583,444 tons of coal were shipped through the Delaware and Raritan Canal, and by a statement of the Board of Port Wardens, it is shown that the whole number of coastwise vessels which arrived in this port last year was 5233, of which 4521, or 86 per cent. went to the wharves of Port Richmond for coal, leaving 712 arrivals for other cargoes. The real prosperity of this section of the city is therefore dependent upon the extension of this valuable trade, which must affect favorably the property of the plaintiffs, whose real interest is that they should fail in their application to this court.

The first attempt to improve Richmond was made about fifty years ago by making it a depot for the rafting and lumber trade of the Delaware, which ruined its original projectors. The same fate would have attended the original purchasers of the Bush Hill estate, if they had not compromised with the owners; and in later years the speculation in League Island proved a failure. And yet all these projects were wise and judicious, except that they were a quarter of a century in advance of the age.

For my own part, I firmly believe that it is the interest of these plaintiffs that their bill should be dismissed.

> Decree affirmed and appeal dismissed, at the costs of the appellants.

THOMPSON, C. J., dissented.